## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**ELIZABETH C. SORROW,**      :
     :
    **Plaintiff,**      :
     :
    **v.**      :      **CIVIL ACTION FILE NO.**
     :      **1:13-cv-02883-AJB**
**CAROLYN W. COLVIN,**      :
***Commissioner, Social***      :
***Security Administration,***      :
     :
    **Defendant.**      :

## ORDER AND OPINION[1]

Plaintiff Elizabeth C. Sorrow ("Plaintiff") brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Supplemental Security Income Benefits ("SSI") under the Social Security Act.[2] For the

---

[1]      The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. [*See* Dkt. Entries dated 10/21/13 & 10/22/13]. Therefore, this Order constitutes a final Order of the Court.

[2]      Title II of the Social Security Act provides for federal Disability Insurance Benefits ("DIB"). 42 U.S.C. § 401 *et seq*. Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for SSI benefits for the disabled. Unlike Title II claims, Title XVI claims are not tied to the attainment of a particular period of

reasons below, the undersigned **REVERSES** the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.     PROCEDURAL HISTORY

Plaintiff filed an application for SSI on October 29, 2009, alleging disability commencing on January 1, 2000.  [Record (hereinafter "R") 122-25].  Plaintiff's applications were denied initially and on reconsideration.  [*See* R75-76].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R93-95].  An evidentiary hearing was held on July 20, 2011.  [R47-74].  The ALJ issued a decision on April 10, 2012, denying Plaintiff's application on the ground that she had not been under a "disability" from the time the application was filed through the date of the decision.  [R31-46].  Plaintiff sought review by the Appeals Council, and the Appeals

---

insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).     Thus, in general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.  *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI).  Therefore, to the extent that the Court cites to DIB cases, statutes, or regulations, they are equally applicable to Plaintiff's SSI claims.

Council denied Plaintiff's request for review on July 1, 2013, making the ALJ's decision the final decision of the Commissioner.  [R1-6].

Plaintiff then filed an action in this Court on August 29, 2013, seeking review of the Commissioner's decision.  [*See* Doc. 1].  The answer and transcript were filed on December 30, 2013.  [*See* Docs. 6, 7].  On February 10, 2014, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 10]; on March 24, 2014, the Commissioner filed a response brief in support of the decision, [Doc. 12]; and on April 7, 2013, Plaintiff filed a reply brief in support of her petition for review, [Doc. 13].  The Court heard oral arguments on February 12, 2015. [*See* Doc. 14].  The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs, and the parties' oral arguments, and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    STATEMENT OF FACTS[3]

### A.    *Background*

On October 29, 2009, Plaintiff filed for SSI, alleging disability due to borderline intellectual functioning, multiple personality disorder, and mood and anxiety disorders.

---

[3]      In general, the records referenced in this section are those deemed by the parties to be relevant to this appeal.  [*See* Docs. 10, 12, 13].

3

[R77, 122, 136].  She was twenty-four years old on the date her application was filed and twenty-seven years old when the ALJ issued his decision.  [*See* R42, 75, 122].

### B.    *Plaintiff's Testimony*

Plaintiff indicated that she lived with her mother for most of her life and that she had had too many stepfathers to count.  [R54].  She testified that she was abused as a child, had been raped on multiple occasions, and had a miscarriage when she was fourteen years old.  [R70-71].  She stated that when she was a child, there was a "fist in my face continuously by one of my mom's boyfriends."  [R61].  She reported having attended school through the eleventh grade.  [R53].  Plaintiff stated that she had recently begun attending twice-weekly classes to obtain a GED but was having difficulties with claustrophobia in the classroom and flashbacks to being raped.  [R53-54, 69-70].

Plaintiff lived with her grandfather for a period of time in her adult years.  [R54].  At the time of the hearing, a foster parent had custody of Plaintiff's four-month-old son, and Plaintiff was living with them and the foster father's eighteen-year-old daughter.  [R57, 67-68].  Plaintiff's oldest child is in the custody of the child's father, and her middle child has been adopted out.  [R63-64, 66-67].

AO 72A
(Rev.8/8
2)

Plaintiff testified that she has flashbacks about four to five times a week, during which she curls up in a fetal position and sobs uncontrollably.  [R55, 59-60, 72].  She stated that when she has a panic attack, it feels like there is something on her chest pressing down and taking her airway out.  [R59].  The attacks can last all day or just come and go.  [R55].  Plaintiff indicated that nothing specific brings them on, [R55], and that her medications have not leveled them out for her, [R60].  She stated that it is difficult for her to stay in a room with a man she does not know, and she is unable to block out the extremely distressing memories.  [R61-62].

When asked whether she is expected to clean or take care of the house or take care of herself, she replied, "Right now, I have to try to take care of myself, and I do try to take care of my son, when I can.  But like I had said, earlier, prior, that when they - - when the flashbacks starts [sic] hitting, I start curling up before I realize it.  And I just stay there until it's over."  [R57].  She indicated that she is unable to keep to a daily routine because of her difficulty sleeping, panic attacks at night, and depression, which makes her want to keep to herself and cry, [R57-58], and that she had been unable to keep a job for more than six months.  [R72].

5

Plaintiff reported that she had been taking trazodone[4] and Celexa[5] until she had to stop when she became pregnant with her son. [R56, 71]. She testified, however, that the medications did not help at all with her depression or flashbacks, made her sleepy if she took them at the same time, and rendered her unable to care for herself. [R56-57, 72].

## C.    Administrative Records

In an undated disability report, Plaintiff reported that she was depressed and suicidal and that the medication she took—Celexa and trazodone—made it so that she could not work. [R136, 140]. She stated that she was crying, "pacing the floor," and unable to concentrate. [R136].

In an adult function report dated November 17, 2009, completed with her mother's help, Plaintiff reported that she can make sandwiches or frozen dinners, shops for food and other things approximately once per week, and can care for her personal

_____

[4]      Trazodone is a serotonin modulator used to treat depression. MedlinePlus, Trazodone,  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html  (last visited 1/13/15).

[5]      Celexa (citalopram) is a selective serotonin reuptake inhibitor (SSRI) used to treat depression. See MedlinePlus, Citalopram, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last visited 1/13/15).

6

needs, but needs help with any housework she does, hardly ever goes out, and almost never goes out alone.  [*See* R144-51].  She stated that her interests were watching television, listening to music, and sometimes working a crossword book.  [R148].  She reported having problems getting along with others, such as her grandmother, husband, one brother, ex-boyfriends, and "a lot other's [sic]."  [R149].

In a third-party adult function report dated November 29 and 30, 2009, Plaintiff's grandfather stated that (1) the effects of her medications, physical and mental fatigue, and loss of focus prevent Plaintiff from doing housework; (2) she is disagreeable and tired all of the time; (3) she cannot get out of bed; (4) sometimes she bathes and sometimes she cannot; (5) she needs reminders to put on clean clothes; and (6) she has difficulty sleeping.  [R149-63].  He also indicated that Plaintiff's only activities are watching television and talking on the telephone and that although she can count change, she is otherwise incapable of managing money.  [R157-58].

In an undated disability appeal report, Plaintiff stated that her medications prevented her from working as they made her suicidal, sleepy, irritable, and "zoned out."  [R174].

### D.     Medical Records

In August 2008, Robert G. Stephens III, M.D., at Athens Regional Medical Center evaluated Plaintiff as the request of Dr. Rajiv Desai. [R198-201]. Dr. Desai had requested a psychiatric consultation to determine whether Plaintiff presented an imminent danger to herself. [R198]. Plaintiff had given birth three days prior and reported that for the past two weeks she had suffered increasingly from a depressed mood, depressive thoughts, crying episodes, low energy, and anhedonia,[6] which she thought was precipitated by multiple family stressors. [R198]. Dr. Stephens noted moderate psychomotor slowing; diagnosed major depression, single episode, moderate; and prescribed Remeron as an antidepressant. [R199-200].

In April 2009, Plaintiff underwent a psychiatric evaluation with Dr. Scott Snyder, M.D., at the request of the Division of Family and Children Services. [R203-08]. Among other things, Dr. Snyder noted that Plaintiff had "good" hygiene. [R206]. Dr. Snyder diagnosed major depression with a current GAF score of 60 and an estimated

---

[6]     Anhedonia is the inability to derive pleasure from most activities. *See* Anxiety Disorders Association of America, Depression, http://www.adaa.org/understanding-anxiety/depression (last visited 1/22/15).

8

high of 90 within the past year,[7] noting that Plaintiff was depressed and not sleeping and had reported a poor appetite and crying spells since August.  [R203, 205, 207].  The notes from the evaluation are otherwise largely illegible.  [R203-08].

In June 2009, Plaintiff began therapy with Mary Elizabeth Trent, Psy.D., P.C. [R313].  Plaintiff reported a history of rape, incest, abuse, neglect, and foster care. [R313].  She also indicated that her children were in care for "failure to thrive" and that the older child had also been molested.  [R313].  Dr. Trent noted that Plaintiff was clean and well-kempt and that her motor function appeared somewhat slowed.  [R313]. Dr. Trent also diagnosed major depressive disorder, recurrent, moderate; anxiety disorder; and borderline intellectual functioning.  [R313].

---

[7]    The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR").  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.* at 34.  A GAF score in the range of 81 to 90 indicates "[a]bsent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."  *Id.*

AO 72A (Rev.8/82)

At an appointment occurring early in July 2009, Dr. Trent took an extensive history.  [R314-17].  Plaintiff reported that she had moved throughout her childhood and had been in foster care.  [R315].  She stated that she was first sexually assaulted at age eight, by her biological father.  [R315].  Starting at age twelve, she was raped by her mother's boyfriend, and at age fourteen, she miscarried.  [R315].  She became pregnant again at age fifteen and had an abortion.  [R315].  The same year, she attempted to kill her mother and was hospitalized for almost three months.  [R315].  From ages fifteen through nineteen, Plaintiff had a relationship with an older man who became mentally and physically abusive.  [R315].  She had multiple miscarriages.  [R315].  At age nineteen, Plaintiff had a one-night stand with another man and became pregnant with her first daughter.  [R315].  Plaintiff then married a Pakistani man who became mentally abusive and who, at the time of the counseling session, Plaintiff was in the process of divorcing.  [R316].  In December 2007, Plaintiff became pregnant by another man whose parents subsequently took out a temporary protective order against her.  [R316].  In August 2008, Plaintiff's second daughter was born and Plaintiff was back together with the child's father.  [R316].  In December 2008, Plaintiff's children were removed from her custody, and in April 2009, Plaintiff broke up with her second child's father and moved in with her grandmother.  [R316].  The grandmother's

10

husband then began sexually assaulting her, and in May 2009, Plaintiff moved in with her grandfather. [R316]. Plaintiff reported having no contact with her biological father and very little contact with her biological mother and indicated that her only real contact was with her grandfather and half-brother. [R316-17].

In July 2009, Plaintiff began treatment at Advantage Behavioral Health Systems Clarke County Clinic ("Advantage"). [R209-13, 243-47]. She was seen by Laura Duncan, Clinical Nurse Specialist. [R213, 247]. Plaintiff reported poor sleep, poor appetite, anxiety, irritability, and a history of sexual and physical abuse. [R209, 243]. It was noted that Plaintiff had taken Remeron for one month, that it had "worked well," and that Plaintiff's depressed mood returned after she discontinued the medication. [R209, 243]. Ms. Duncan also noted that Plaintiff appeared to be neatly groomed. [R210, 244]. Noting Plaintiff's depressed mood, Ms. Duncan diagnosed major depressive disorder, recurrent, moderate, and post-traumatic stress disorder ("PTSD") and assigned a GAF score of 60. [R210-11, 243-47].

Plaintiff saw Dr. Trent again at the end of July 2009. [R319]. Dr. Trent again noted her diagnoses of major depressive disorder, recurrent, moderate; anxiety disorder; and borderline intellectual functioning. [R319]. Dr. Trent noted that Plaintiff appeared depressed, anxious, and quiet, with slowed motor function, but was clean and well

11

kempt.  [R319].  Plaintiff reported improvement in her mood with Celexa and trazodone.  [R319].  She reported planning to start a cleaning job the following week and to get her driver's license soon after.  [R319].

Dr. Trent's treatment notes from August 2009 indicate that Plaintiff appeared tired, depressed, and slow.  [R320-23].  She reported that she had not gotten the job or her driver's license.  [R320].  She also indicated that trazodone made her tired and that she had difficulty waking up.  [R321-23].  She reported planning to have her teeth fixed the next month.  [R323].

Dr. Trent's treatment notes from October 2009 indicate that not much had changed.  [R324-26].  She noted that Plaintiff was anxious, slow, and depressed, with a flat affect.  [R324-26].  Plaintiff also reported having difficulties with her memory. [R324-25].

In mid-October 2009, Dr. Trent noted that Plaintiff was accompanied by her grandfather.  [R326].  Plaintiff had been in the emergency room the prior night with several abscessed teeth and was unkempt, "out of it" on pain medication, and unable to talk.  [R326].

At a visit at the end of October 2009, Dr. Trent noted that Plaintiff was again well kempt and clean and that her energy and mood were better.  [R327].  She noted

AO 72A
(Rev.8/8
2)

that her teeth were better and that two of them had been removed. [R327]. Plaintiff also indicated that she had seen a doctor for her memory concerns and had been referred for further testing. [R327]. Plaintiff also stated that she had spoken with her prescribing doctor about the effects of the trazodone on her functioning but that the doctor wanted to continue with same dose. [R327-28].

Dr. Trent noted in November 2009 that Plaintiff's mood was much improved. [R329]. She was still waiting for the memory testing and was scheduled to have additional oral surgery in mid-November. [R329]. Plaintiff also reported that she had never divorced and was getting back together with her ex-husband. [R331].

In December 2009, Dr. Trent noted that Plaintiff reported having gone "off the deep end" with suicidal thoughts and flashbacks to when her kids were taken away. [R332]. December 2009 nursing progress notes at Advantage indicate that Plaintiff was not reacting well to medication. [R240]. She had been off of medication for a week and was having anxiety and crying spells, walking the floor, feeling worthless, and not sleeping well. [R240-42]. At her next session with Dr. Trent, Plaintiff indicated she was "better now that me and my husband are back together," but also stated that she did not "really know" her feelings and that her moods changed every day. [R333]. She also reported that her memory was "more stable" and "getting better." [R234].

AO 72A
(Rev.8/8
2)

Plaintiff participated in group counseling at Advantage in January 2010 to identify coping strategies for anger management.  [R257].  It was noted that she was lethargic from the trazodone with persistent depressive symptoms.  [R257, 260-61].  Although Plaintiff was observed to have "neat" grooming, [R254], it was also noted that she needed dental care and had lost several teeth, [R256].  Notes also indicate that Plaintiff reported that she sometimes had difficulty concentrating but was not having difficulty at that time.  [R255].

In February 2010, non-examining Agency psychologist Spurgeon Cole, Ph.D., provided a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  [R218-35].  Dr. Cole opined that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, but otherwise was not significantly limited with regard to concentration, persistence, or pace.  [R232].  He further specified:  "No problems carrying out short, simple as well as detailed instructions but would have infrequent difficulty sustaining concentration over long periods of time.  Can sustain an ordinary routine without supervision and can make simple work-related decisions. Infrequent lapses in focus. (no substantial limitations)."  Dr. Cole also found that Plaintiff was moderately limited in her ability to interact appropriately with the general public, accept instruction, respond appropriately to

14

criticism from supervisors, and respond appropriately to changes in the work setting. [R232-34].

On January 4, 2011, Harvey Gayer, Ph.D., evaluated Plaintiff for the Agency. [R267-73].  Dr. Gayer reviewed Dr. Snyder's psychiatric evaluation, interviewed Plaintiff's grandfather, and interviewed Plaintiff. [R267].  He noted that Plaintiff was divorced; had two daughters, ages six and two, of whom she did not have custody; was seven months pregnant with her third child; and lived with her grandfather. [R267-68]. Plaintiff reported that she had been molested by her step-grandfather and raped by her mother's boyfriend during her childhood and that she frequently experienced flashbacks, blackouts, and disassociation, and often had nightmares. [R268].  She indicated that she was frequently tired, had difficulty concentrating, and sometimes failed to take adequate care of her personal hygiene. [R268].  Plaintiff's grandfather told Dr. Gayer that he had to frequently remind her to "engage in basic hygienic practices such as bathing and brushing her teeth." [R268].

Dr. Gayer observed that although Plaintiff exhibited appropriate hygiene, her teeth appeared to be rotten. [R268].  He also noted that her mood was sad, but that her long-term memory appeared intact, her attention, concentration, and short-term memory

15

appeared to be adequate, and she appeared to have adequate insight into her difficulties. [R269].

Plaintiff's grandfather completed the Adaptive Behavior Assessment System II, in order to determine Plaintiff's level of adaptive functioning.  [R271].  Her overall score was in the extremely low range, suggesting impaired adaptive functioning. [R271].  Plaintiff's grandfather also completed the DSM-IV Criteria Checklist and highly endorsed symptoms of anxiety, depression, psychosis, and dependency.  [R271].

Dr. Gayer administered Plaintiff the Miller Forensic Assessment of Symptoms Test, which is designed to screen for malingered psychiatric illness.  [R269, 272].  He noted that her score was "suggestive of the possibility of malingered psychopathology" but also that there were no other indications of malingering throughout the assessment, that Plaintiff "appeared to put forth her best effort on all tasks presented to her," and that she "appeared to be forthcoming and honest during [the] clinical interview." [R269, 272].  He therefore concluded that although the information contained in the evaluation "should be reviewed with the possibility of malingering in mind, he believed the evaluation was "an accurate estimate of [Plaintiff's] current functioning."  [R269, 272].

16

Plaintiff obtained a full-scale IQ score of 72 on the Wechsler Adult Intelligence Scale–Fourth Edition ("WAIS-IV") and a standard score of 71 on the Bender Visual Motor Gestalt Test–II.   [R269-70].  Both scores were in the "borderline" range, and Dr. Gayer noted that the latter suggested impaired visual-motor integration and/or fine-motor skills.  [R270].  On the Wide Range Achievement Test–4 ("WRAT-4"), Plaintiff obtained scores of 79 in reading and 73 in math, also in the borderline range and consistent with expectations given her cognitive functioning.  [R270-71].

Dr. Gayer diagnosed major depressive disorder, recurrent, severe with psychotic features; chronic PTSD; and borderline intellectual functioning; with a current GAF score of 48.[8]  [R271-72].  Based upon his observations and the test results, Dr. Gayer concluded that Plaintiff would likely have difficulty completing tasks in a timely manner due to her depressive symptoms and intellectual limitations and that Plaintiff may have impaired visual-motor integration and/or fine motor skills.  [R272].  He opined that she presented as friendly and cooperative, that she was unlikely to have substantial difficulty getting along with others, and that her attention was adequate "in

_____

[8]     A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

17

the brief one-to-one evaluation setting." [R273]. Dr. Gayer concluded that Plaintiff's prognosis was guarded and that if she were awarded benefits, a payee was necessary based on her current cognitive and adaptive capabilities. [R273].

Later in January 2011, non-examining Agency consultant Linda O'Neil, Ph.D., provided a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. [R274-91]. Dr. O'Neil opined that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace, and that she had mild restriction of activities of daily living and difficulties in maintaining social functioning, and she stated that she had insufficient evidence to determine whether Plaintiff had episodes of decompensation of an extended duration. [R284]. She observed that Plaintiff had previously been determined capable of performing simple, routine, repetitive tasks and that there was no evidence or claim of worsening. [R286]. She opined that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek; and to respond appropriately to changes in the work setting. [R288-89]. Dr. O'Neil further remarked that Plaintiff might have "some episodic issues with extended CPP [(concentration, persistence, or pace)] but is able to do simple tasks," and might have some trouble with stress, but could handle "fairly

18

low-demand tasks." [R290].  She concluded her opinion with the statement, "Capable of srrts [(simple, routine, repetitive tasks)].  Not substantially limited." [R290].

In June 2011, Plaintiff presented at Advantage with complaints of depression. [R296-312[9]].  She complained of sleeplessness, nightmares, flashbacks, loss of appetite, fluctuating moods, anxiety, poor concentration, and social withdrawal.  [R299-301].  She reported that she had stopped taking medication due to pregnancy.  [R299].  It was noted that Plaintiff had problems with dental hygiene.  [R299].  Plaintiff reported that she had been living with her boyfriend since January 2011 and that they lived with her three-month-old baby.  [R304].  She indicated that she had two other children—a seven-year-old who lived with the child's father and a two-year-old who had been adopted out—and that although they lived locally, she did not interact with them. [R304].  She indicated that she relied on her boyfriend for social support and that she occasionally talked with her grandfather.  [R304].  Plaintiff also reported her history of childhood sex abuse and indicated that she had been emotionally abused by her mother.  [R304].  It was noted that Plaintiff had previously taken Celexa and trazodone

_____

[9]     Plaintiff argues that the ALJ's reliance on medical records appearing in the Agency record as Exhibit 18F is problematic because they are illegible and therefore cannot be reviewed by the Court.  [Doc. 10 at 19 [referencing R296-312]].  The Court, however, can read them and has considered them in its adjudication of this appeal.

19

and that they were both helpful.  [R305].  Plaintiff's stated treatment goal was to be

able to leave the house at least twice a month for the next six months.  [R306-07].

Shahzad Hashmi, M.D., diagnosed major depressive disorder, recurrent, moderate, and

PTSD, and he assigned a GAF score of 60.  [R310-12].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant has not engaged in substantial gainful activity since October 29, 2009, the application date (20 CFR 416.971 *et seq.*).

2.   The claimant has the following severe impairments: borderline intellectual functioning (BIF), depression, and post traumatic stress disorder (PTSD) (20 CFR 416.920(c)).

. . .

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

. . .

4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity [("RFC")] to perform the basic mental demands of unskilled work at all exertional levels.

. . .

20

5.     The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on March 17, 1985 and was 24 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.     The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

. . .

10.    The claimant has not been under a disability, as defined in the Social Security Act, since October 29, 2009, the date the application was filed (20 CFR 416.920(g)).

[R31-36].

The ALJ explained that Plaintiff had only mild restriction in her activities of daily living, "as evidenced by her abilities to care for her four month old son, care for her own personal care needs, maintain a relationship with her boyfriend, prepare simple meals, and help with household chores." [R38 [citing R143-51 (Adult Function Report, Nov. 17, 2009)]].  He also found that Plaintiff had only mild difficulties in social

21

functioning because she was able to maintain a relationship with her boyfriend, shop, and attend GED courses.  [R38 [citing R143-51 (Adult Function Report, Nov. 17, 2009)]].   The ALJ further explained that despite Plaintiff's reports of memory difficulties and her diagnosis of borderline intellectual functioning, he found  that Plaintiff had only moderate difficulties with regard to concentration, persistence, or pace, "as evidenced by her abilities to watch TV programs and attend GED classes." [R38 [citing R265-73 (Gayer evaluation); 236-47 (Advantage treatment records, July 2009 through June 2010); 209-13 (Advantage psychiatric evaluation, July 15, 2009)].

The ALJ also explained that he found Plaintiff's testimony regarding her limitations to be less than fully credible based on the "longitudinal medical record" and Plaintiff's and her grandfather's reports regarding her activities of daily living. [R39-41].  As to the medical evidence, the ALJ noted that treatment for Plaintiff's mental health had consisted primarily of "conservative medication management" and that she had required no inpatient hospitalization or intensive therapy for her alleged symptoms; that Plaintiff had been assigned GAF scores "in the 60's and up to the 90's; that Plaintiff had "had unremarkable mental health examinations at multiple treatment sessions"; and that the treatment had been effective.  [R40-41].  The ALJ also explained

22

that he gave little weight to Dr. Gayer's opinion because Plaintiff was possibly malingering and because Dr. Gayer's opinion was "inconsistent with the longitudinal record" and that he gave "great weight" to the opinions of the reviewing consultants because those opinions were consistent with the longitudinal medical record. [R40].

As to the activities of daily living, the ALJ stated that Plaintiff had testified that the father of her four-month-old son was a family friend and lived with Plaintiff, Plaintiff's foster father, and Plaintiff's son; that Plaintiff cares for herself and her son, although her flashbacks make it difficult; and that she had recently begun taking GED classes. [R39-40]. The ALJ further stated that Plaintiff's grandfather's third-party function report indicated that Plaintiff could prepare simple meals, care for her hygiene, shop, and visit with friends. [R40]. He explained that this "engag[ement] in a variety of activities of daily living" and ability to take care of her four-month-old son "belie[]" her claims of total disability." [R40].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

23

12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).   The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity.   *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).   At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities.

24

*See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience.   *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work.   *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work.   *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any

25

substantial gainful activity that exists in the national economy. *Doughty*,

245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983),

*superceded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in*

*Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## V.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits

by the Commissioner.  Judicial review of the administrative decision addresses three

questions:  (1) whether the proper legal standards were applied; (2) whether there was

substantial evidence to support the findings of fact; and (3) whether the findings of fact

resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296

(N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court

may not decide the facts anew, reweigh the evidence, or substitute its judgment for that

of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If

substantial evidence supports the Commissioner's factual findings and the

Commissioner applies the proper legal standards, the Commissioner's findings are

conclusive.  *Lewis v. Callahan*, 125 F.3d1436, 1439-40 (11th Cir. 1997); *Barnes v.*

*Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529

(11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam);

AO 72A
(Rev.8/8
2)

*Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff contends that the ALJ's RFC determination is flawed because he erroneously rejected the findings of the examining psychologist; failed to address the limitations imposed by the reviewing physicians and the limitations caused by Plaintiff's medication; and misrepresented Plaintiff's activities of daily living. [Doc. 10 at 5, 13-24[10]].   She also argues that the ALJ erred by failing to consult a vocational expert despite his finding that Plaintiff had three severe mental impairments. [*Id*. at 5, 24-25].   The undersigned considers the arguments in their logical order.

### A.   *Expert Opinions*

#### 1.   *Arguments*

Plaintiff first argues that the ALJ's decision to give little weight to the opinion of examining psychologist Dr. Gayer is not supported by substantial evidence. [*Id*. at 15-17, 19-20].   She points out that although Dr. Gayer noted that the results of one test suggested the "possibility" of malingering, he concluded that because there were no other indications of malingering throughout the assessment, Plaintiff appeared to put forth her best effort on all of the tasks presented to her, and she appeared to be

---

[10]   Where, as here, the original page numbering differs from the numbering assigned by the Court's electronic filing system, the Court will use the numbers assigned by the electronic filing system.

AO 72A
(Rev.8/8
2)

forthcoming and honest during the clinical interview, he believed his evaluation to be an accurate estimate of Plaintiff's functioning, [*id*. at 15-16 [citing R269]], and she argues that by nevertheless discounting the opinion, the ALJ impermissibly substituted his own opinion for that of an expert, [Doc. 10 at 15-16 (citing *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982) (per curiam))].   Plaintiff also suggests that the test that indicated the possibility of malingering was inappropriate for testing individuals with intellectual limitations.   [Doc. 10 at 16].   Plaintiff further argues that it was illogical for the ALJ to accept Dr. Gayer's diagnoses of borderline intellectual functioning and depression yet fail to consider the impaired visual-motor integration and/or fine motor skills indicated by the same test results and reject Dr. Gayer's conclusion that the impairments were likely to cause Plaintiff to have difficulty completing tasks in a timely manner.   [*Id*. [citing R36, 269-70]].   Plaintiff additionally argues that the ALJ's explanation that Dr. Gayer's opinion was inconsistent with the mental-health treatment notes of record is unsupportable, as he failed to acknowledge records showing that Plaintiff's episodes of improvement were intermittent and isolated and that she instead consistently presented as slow, anxious, and depressed with a flat affect.   [Doc. 10 at 19-20 [citing R257, 313-14, 319-33]].

29

Plaintiff also contends that the ALJ failed to acknowledge the limitations stated in the reviewing opinions to which he purportedly assigned "great weight," including determinations that Plaintiff would have occasional problems interacting with people, infrequent problems adapting to workplace changes, and infrequent lapses in focus, and that she was limited to "fairly low-demand tasks." [Doc. 10 at 18 [citing R234, 290]]. She argues that it is therefore impossible for the Court to determine that the ALJ's conclusions were rational and supported by substantial evidence. [Doc. 10 at 18-19 (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981))].

The Commissioner, in response, points out that a one-time examiner need not be given deference. [Doc. 12 at 9 (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987))]. She further argues that the ALJ was justified in his decision to discount Dr. Gayer's opinion because the opinion contained cautionary language stating that "[t]he overall validity of this assessment is somewhat questionable," that the "information should be reviewed with the possibility of malingering in mind," and that Plaintiff's scores only "suggest[ed]" that she had impaired visual-motor integration and fine-motor skills, [Doc. 12 at 9-11 [citing R270, 272-73]], and because medical-record

evidence showed moderate-to-unremarkable GAF scores, improvement with medication, and multiple unremarkable mental-health examinations, [Doc. 12 at 11-14 [citing R36, 40, 206-07, 211, 243, 257, 310, 332-33]].  The Commissioner also suggests that the ALJ was justified in disregarding the "occasional" or "infrequent" limitations imposed by the reviewing physicians because the reviewing physicians had further stated that Plaintiff had "no substantial limitations" or was "not substantially limited." [Doc. 12 at 14-15 [citing R234-35, 290]].  At oral argument, the Commissioner also contended that even if the ALJ did err in discounting or not clearly explaining why he gave little weight to Dr. Gayer's opinion, the error is harmless because Dr. Gayer found that Plaintiff is unlikely to have substantial difficulty getting along with others and her attention was adequate, and although Dr. Gayer did find that Plaintiff is likely to have difficulty completing tasks in a timely manner, [citing R273], other record evidence indicates that difficulty with concentration was not a severe ongoing issue, [citing R147 (Plaintiff's statements that she can shop for food once per week, can prepare sandwiches and reheat frozen meals, and is sometimes interested in working a crossword book); 255 (Advantage notes indicating that Plaintiff reported sometimes having trouble concentrating but having no such difficulties at that time); 269

31

(Dr. Gayer's notes that Plaintiff's attention and concentration appeared to be adequate)].

In reply, Plaintiff reiterates many of the arguments stated in its opening brief. [Doc. 13 at 2-4]. She also points out the logical inconsistency inherent in the ALJ's wholehearted embrace of Dr. Gayer's finding regarding the "possibility" of malingering and simultaneous rejection of Dr. Gayer's limitations findings on the grounds that the scores only "suggest[ed]" that Plaintiff had impaired visual-motor integration and fine motor skills and it was only "likely" that she would have difficulty completing tasks in a timely manner. [*Id.* at 4]. She also notes that one of the Agency reviewers the ALJ relied on gave certain portions of Dr. Gayer's findings moderate weight without explaining why, and she suggests that the ALJ relied on the reviewer's impermissible reinterpretation of Dr. Gayer's testing results. [*Id.* at 2 [citing R267-73, 286]]. Plaintiff further argues that the ALJ could not ignore the limitations found by the reviewing physicians simply because those physicians stated that the limitations were not "substantial," suggesting that such statements amount to vocational opinions that are beyond the purview of a medical expert. [Doc. 13 at 5 (citing 20 C.F.R. § 416.921(a); Social Security Ruling ("SSR") 85-15)]. At oral argument, Plaintiff responded to the Commissioner's "harmless error" argument by pointing out that the IQ results cited by

32

the ALJ in support of his finding that Plaintiff had the severe impairment of borderline intellectual functioning also indicated that Plaintiff's memory and processing speed are below average, [citing R36-37, 270], and pointing to medical records where she reported having poor concentration, [R299]. Plaintiff also argued that medical records indicating that she was able to maintain attention adequate for medical evaluation is not equivalent to a showing that she is able to think at a pace that would allow her to perform sustained work.

### 2.    *Discussion*

As to the ALJ's treatment of Dr. Gayer's opinion, the Court is unconvinced by Plaintiff's argument that the Court should discount the value of the testing that suggested a possibility of malingering because the test was inappropriately administered. As Plaintiff herself acknowledges, the adjudicator is not free to substitute his own opinion for that of an expert.  [Doc. 10 at 16 (citing *Freeman*, 681 F.2d at 731)].  Accordingly, the Court refrains from second-guessing Dr. Gayer's opinion as to the appropriate methodology for determining whether Plaintiff's test results may have been tainted by malingering.

Nevertheless, the Court cannot find that the ALJ's decision to significantly discount Dr. Gayer's opinion was supported by substantial evidence.   The

AO 72A
(Rev.8/8
2)

Commissioner is correct in noting that Dr. Gayer's cautionary language regarding the possibility of malingering and certain positive findings in the medical records support the ALJ's decision to discount Dr. Gayer's opinion. It is problematic, however, that the ALJ failed to acknowledge significant medical evidence supportive of Dr. Gayer's opinion. Most curiously, the ALJ embraced the idea that Plaintiff may have been malingering without acknowledging Dr. Gayer's opinion that his evaluation was in fact an accurate assessment of Plaintiff's functioning. [R269, 272]. It is also troubling that the ALJ disregarded Dr. Gayer's opinions as to Plaintiff's motor skills and stated that Dr. Gayer's opinion that Plaintiff would likely have difficulties completing tasks in a timely manner was inconsistent with the longitudinal medical record without making any attempt to reconcile his decision with treating-physician Dr. Trent's diagnosis of borderline intellectual functioning, [R313-14, 319-24, 326-27, 329, 331-32], or the repeated clinical observations of slowed motor functioning, [R199-200, 313-14, 319, 321-24, 326], all of which appear to corroborate Dr. Gayer's test results and medical opinions. [*See* R40]. In order to determine that the ALJ's decision was supported by substantial evidence, it must be clear the that ALJ took into account evidence both favorable and unfavorable to his opinion. *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (holding that an administrative decision is not supported by

34

"substantial evidence" where the ALJ acknowledges only the evidence favorable to the decision and disregards contrary evidence). The ALJ's decision does not provide sufficient grounds for such a determination. Moreover, contrary to the Commissioner's "harmless error" argument, when they are properly considered upon remand, the repeated observations of slowed motor functioning certainly could provide grounds for the ALJ to determine that Dr. Gayer's test results showing slowed processing speed and his opinion of Plaintiff's ability to complete tasks in a timely manner should have been given greater weight and should have led to a more limited RFC.

The Court is also unpersuaded by the Commissioner's argument that the ALJ discounted Dr. Gayer's opinion regarding Plaintiff's impaired visual-motor integration and/or fine motor skills and her ability to timely complete tasks because Dr. Gayer stated that the test of Plaintiff's visual-motor ability "suggests" an impairment and that his observations and the test date indicate that she is "likely" to have difficulty completing tasks in a timely manner due to her depressive symptoms and intellectual limitations. [*See* R270, 272-73]. The ALJ's decision included no such explanation, and the Court declines to presume the validity of the Commissioner's post-hoc rationalization. *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) ("We decline . . . to affirm simply because some rationale might have supported the

ALJ's conclusion.  Such an approach would not advance the ends of reasoned decision making.").

The Court is also concerned by the ALJ's failure to acknowledge the reviewing physicians' opinions that Plaintiff would have occasional problems interacting with people, infrequent problems adapting to workplace changes, and infrequent lapses in focus, and that she was limited to "fairly low-demand tasks." [*See* R234, 290]. Although the Commissioner attempts to explain away the omissions by noting that the reviewing physicians qualified their opinions by stating that the limitations were not "substantial," she provides no authority indicating that a physician is qualified to determine whether a limitation would "significantly erode the occupational base," [*see* Doc. 12 at 15], nor is the Court aware of any basis for finding that physicians typically possess such expertise.  Thus, the undersigned finds the ALJ's assignment of "great weight" to the opinions of the reviewing physicians, [R40], to be in conflict with his failure to address their limitations determinations or to incorporate those limitations into the RFC, [R39].

The Eleventh Circuit has held that where a claimant has even slight or mild nonexertional limitations arising from mental impairments, the ALJ may not presume that the grids apply and must instead engage a vocational expert to establish whether

AO 72A
(Rev.8/8
2)

the claimant can perform work that exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989) (per curiam) (holding that it was error to apply the grids where the claimant's impairments arising from borderline intellectual functioning and dysthymic disorder precluded her from performing complex tasks and working under extraordinary stress); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) ("When there have been nonexertional factors (such as depression and medication side effects) alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert."); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) ("If nonexertional impairments exist, the ALJ may use Medical-Vocational Guidelines as a framework to evaluate vocational factors, but must also introduce independent evidence, preferably through a vocational expert's testimony, of existence of jobs in the national economy that the claimant can perform.") (citing *Wolfe v. Chater*, 86 F.3d 1072, 1077-78 (11th Cir. 1996). Here, after giving "great weight" to the opinions of the reviewing physicians, the ALJ found that Plaintiff suffers from severe mental impairments, including borderline intellectual functioning, depression, and PTSD. [R36, 40]. By definition, severe impairments "significantly limit [the claimant's] . . . ability to do basic work activities." 20 C.F.R. § 416.921(a) (distinguishing severe impairments from

37

non-severe impairments); *accord Raduc v. Comm'r of Soc. Sec.*, 380 Fed. Appx. 896, 898 (11th Cir. May 27, 2010) (per curiam).  Indeed, the ALJ found that Plaintiff had mild difficulties with social functioning and moderate difficulties with concentration, persistence, or pace. [R38].  Consequently, it appears that even if the ALJ had properly discounted Dr. Gayer's opinion, his assignment of great weight to the opinions of the reviewing physicians and his own findings of severe mental impairments and difficulties with social functioning and concentration, persistence, or pace would have required that he also solicit the testimony of a vocational expert in order to determine whether the nonexertional limitations significantly compromised Plaintiff's work skills or precluded her from performing a wide range of work at any exertional level.

For these reasons, the undersigned concludes that the ALJ erred in his consideration of the medical-expert evidence and in failing to solicit vocational-expert testimony.  The case is therefore due to be **REVERSED** and **REMANDED** for further consideration consistent with this Order.

### B.    *Credibility*

Plaintiff has also shown that several aspects of the ALJ's credibility determination also bear further consideration upon remand.  The ALJ has discretion in making credibility determinations after listening to a claimant's testimony, "[b]ut the

38

ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). "The credibility determination does not need to cite 'particular phrases or formulations' but it cannot merely be a broad rejection which is 'not enough to enable [the court] to conclude that [the ALJ] considered [a plaintiff's] medical condition as a whole.' " *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotation marks omitted) (quoting *Foote*, 67 F.3d at 1561). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1562.

### 1.   *"Totally Disabled"*

Plaintiff argues that the ALJ erred in finding that Plaintiff's daily activities "belie[] her claims of total disability." [Doc. 10 at 21 [citing R40]]. Specifically, Plaintiff contends that the ALJ's use of the phrase "total disability" indicates that he imposed an improper standard. Despite the ALJ's use of this phrase, it appears that the ALJ understood the proper legal standard. In his discussion of applicable law related to the RFC finding, the ALJ cited 20 C.F.R. § 416.920(e), among other relevant regulations, and stated that "[a]n individual's residual functional capacity is her ability

39

to do physical and mental work activities on a sustained basis despite limitations from her impairments." [R35].  The ALJ also cited SSR 96-8p, the same administrative ruling cited by Plaintiff.  *See Jones v. Astrue*, No. 8:11-cv-611-T-30TBM, 2012 WL 171094, at *4 (M.D. Fla. Jan. 3, 2012) (where plaintiff argued that ALJ appeared to use improper "totally disabled" standard, the court found otherwise "in the light of the ALJ's explication of the issues and the applicable standards for evaluating the same set forth earlier in the decision"); *Rahman v. Astrue*, Civil Action No. 1:11-CV-3094-JSA, 2012 WL 5507314, at *11 n.5 (N.D. Ga. Nov. 14, 2012) (Anand, M.J.) (rejecting argument that ALJ applied an incorrect legal standard in stating that "claimant has not generally received the type of medical treatment one would expect for a totally disabled individual" because "a review of the ALJ's decision as a whole suggests that the ALJ understood the proper legal standard for awarding benefits" and claimant portrayed self at hearing as "totally disabled individual").  *Cf. McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988) (affirming district court although lower court's statement, after restating evidence upon which denial of disability benefits claim was based, that "substantial evidence supported a finding that [disability benefits claimant] was totally disabled," was not proper standard of reviewing denial of benefits, because district court assumed to have applied proper

40

standard and to have weighed evidence properly by virtue of its initial recitation of proper test).

Nevertheless, the use of the term "totally disabled" is ill-advised because it results in confusion. Unless the claimant is found to meet a listing, the ALJ must consider the claimant's residual functional capacity, age, education, past work experience, and whether claimant can do her past work or other available work before he may reach the ultimate determination of whether a claimant is "disabled." *See* 20 C.F.R. § 416.920(a)(4), (e); SSR 96-8p. The relevant credibility question is whether the Plaintiff's activities constitute substantial evidence undermining her testimony as to the extent of her limiting impairments. *See Foote*, 67 F.3d at 1562. Only then may the ALJ take the next steps toward determining what "disabled" ultimately means in Plaintiff's particular case. Thus, should the ALJ upon remand again find that the evidence undermines some aspect of Plaintiff's allegations of limitation, he should articulate the allegation he finds unworthy and the evidence that undermines it.

41

### 2.    *Activities of Daily Living*

Plaintiff also argues that the ALJ erred in finding that Plaintiff engages "in a variety of [activities] of daily living," that she reported that she cares for her four-month-old son, and that she has the ability to maintain a romantic relationship. [Doc. 10 at 21-24 [citing R40]].  She contends that there is no evidence to support the ALJ's findings that Plaintiff maintained an ongoing relationship with a boyfriend or was able to care for her infant son and that the ALJ in fact mischaracterized or ignored significant evidence of Plaintiff's inability to care for her personal needs, maintain relationships, or care for her son.  [Doc. 10 at 22-24].  Plaintiff points particularly to evidence that her relationships are short lived, [R149]; argues that the exhibit the ALJ cites as support for his finding that Plaintiff has only mild restrictions in her activities of daily living reveals extremely limited ability to do housework or leave the house, [R144-51]; contends that her grandfather stated that her medications, fatigue, and loss of focus prevent her from doing housework, she is tired all the time, she cannot leave the bed, she does not always bathe, she needs reminders to bathe, put on clean clothes, and brush her teeth, and she has difficulty sleeping, [R156-63, 268]; points to physicians' observations that her teeth were rotten, [R268]; and cites her own testimony

indicating that she is not responsible for her son but instead tries to take care of him when she can, [R57]. [Doc. 10 at 22-24].

In response, the Commissioner contends that the ALJ properly discounted Plaintiff's credibility based on Plaintiff's and her grandfather's reports of Plaintiff's daily activities and that the ALJ's conclusions are therefore supported by substantial evidence. [Doc. 12 at 17-21]. Specifically, the Commissioner points to numerous notes indicating that Plaintiff had good hygiene or neat grooming, [R206, 210, 244, 254, 268, 308]; the ALJ's reference to treatment notes indicating that Plaintiff lived with her son's father and had been doing so for six months, [R39, 307]; and the ALJ's express consideration of Plaintiff's testimony that flashbacks made it difficult for her to care for her son, [R40, 57]. [Doc. 12 at 19-20]. The Commissioner further argues that because the ALJ did not rely exclusively on Plaintiff's ability to care for her young son, any error as to that aspect of the decision was harmless, [Doc. 12 at 19-20 & n.6], and that the ALJ was not required to refer to all of Plaintiff's grandfather's statements so long as the decision is sufficient to enable the Court to conclude that the ALJ properly considered Plaintiff's condition as a whole, [Doc. 12 at 20-21].

Having carefully reviewed the evidence cited in support of the ALJ's credibility determination, the Court finds merit in Plaintiff's arguments. First, the ALJ's findings

43

that Plaintiff could get along with a boyfriend and cared for her four-month-old son appear to be without evidentiary support.  Notably, the ALJ cited an adult function report dated November 2009 in support of both of the findings, but the report indicates that at the time, Plaintiff was living in a trailer with "Mom" and "Pop," and there is no mention of maintaining a relationship with any boyfriend or living with a boyfriend or baby.  [*See* R39 [citing R143-51]].  In fact, review of the medical evidence indicates that at the time the cited report was completed, Plaintiff reported to Dr. Trent that she was considering what would be an ill-fated attempt to reunite with her ex-husband, [R332], and she was still more than a year away from giving birth to her son, [R267-68].  It also bears noting that although a June 2011 record does indicate that Plaintiff had lived with her boyfriend since January 2011 and that they still lived together with her three-month-old baby, [R304], Plaintiff testified before the ALJ in July 2011 that the child was in foster care, that Plaintiff had also been taken in by the foster parent, and that the boyfriend did not live in the foster home, [R57, 67-68].

Likewise, the Court has been unable to locate any evidence in the record corroborating the ALJ's finding that Plaintiff was able to take care of her son.  Instead, it appears that by the time the child was four months old, a foster parent had custody, and Plaintiff would "try" to take care of him when she could.  [R57].  Thus, it is unclear

44

what, if any, evidence might support a finding that Plaintiff has the ability to maintain personal relationships or care for her son.

Second, it does not appear that the ALJ considered all of the record evidence before finding that Plaintiff was able to care for her personal needs. Specifically, there is nothing in the ALJ's decision to suggest that he considered the numerous medical records showing that Plaintiff had difficulty with dental hygiene and that her teeth were rotting. [*See* R256, 268, 299, 323, 326-27, 329]. Thus, while it appears that the ALJ considered Plaintiff's grandfather's third-party adult function report, [R40], it also appears likely that the portions reporting Plaintiff's difficulties with hygiene may have been given more credence had they been reviewed in light of this corroborating medical evidence. Consequently, the Court cannot find that ALJ's determination that Plaintiff could care for her personal hygiene was based on a review of the full record, viewing Plaintiff's condition as a whole.

### 3.    *Side Effects of Medication*

Plaintiff also contends that the ALJ erred by failing to evaluate the side effects of Plaintiff's medication. [Doc. 10 at 20-21]. She points out that she consistently reported on her Agency forms, in testimony, and in treatment that trazodone made her lethargic and sleepy. [*Id.* at 21 [citing R56-57, 140, 174, 257, 321, 326-27]].

45

The Commissioner, in response, points out that the ALJ expressly noted Plaintiff's testimony that her medications cause her to be sleepy, [Doc. 12 at 16 [citing R39, 56-57]], and argues that it is implied in the ALJ's decision that he discounted Plaintiff's claims of fatigue based on his finding that Plaintiff lacked credibility, [Doc. 12 at 16 [citing R40]].  The Commissioner further contends that the ALJ did not need to consider Plaintiff's complaints of fatigue because she did not indicate how it interfered with her ability to work and because she failed to show that she experienced lethargy and drowsiness for any consecutive twelve-month period due to her medications.  [Doc. 12 at 17].

Upon remand, Plaintiff's complaints that her medication caused lethargy and fatigue also bear review.  As noted above, where an ALJ rejects a claimant's complaints of subjective symptoms, "he must articulate explicit and adequate reasons for doing so."  *Foote*, 67 F.3d at 1561-62.  Here, the ALJ did not articulate his reasons for rejecting Plaintiff's complaints that her medications fatigued her, and, as also noted above, the Court may not rely on the Commissioner's post-hoc rationalizations.  Additionally, the record shows that Plaintiff consistently complained to her medical providers regarding the fatigue and was observed to appear tired, [R257, 321, 323, 326-27]; that she testified that the trazodone made her "to where I'm not even able to really

46

take care of myself," [R56-57]; and that the complaints spanned from at least August 2009, soon after Plaintiff started taking trazodone, [R321-23], through her testimony before the ALJ in July 2011, [R55-57], suggesting that upon reconsideration, the ALJ may reasonably find that the trazodone—the medication purportedly allowing Plaintiff to be capable of working on a regular and continuing basis—both causes fatigue severe enough to limit Plaintiff's ability to work and has persisted for more than twelve months.

### 4.    Conservative Treatment

Additionally, while Plaintiff did not raise the issue, the Court notes that a medical history appearing in the treatment record suggests that in or around the year 2000, Plaintiff was arrested for attempted homicide against her mother and was hospitalized for three months.  [R315].  Although the hospitalization appears to be self-reported and temporally remote, it is in direct conflict with the ALJ's finding that Plaintiff has not required any inpatient hospitalization or intensive therapy for her mental conditions. [R40].  Thus, this finding should also receive further consideration upon remand.

47

## VII.   CONCLUSION

For the reasons set forth above, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED,** this the 12th day of February, 2015.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

48